**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

TARA FORTNEY,

Plaintiff,

v.

GREAT LAKES WINE AND SPIRITS, a Michigan Limited Liability Company,

Defendant.
_________________________________/

Case No. 2:24-cv-12985

Hon. Brandy R. McMillion
United States District Judge

**OPINION AND ORDER DENYING DEFENDANT'S MOTION TO STRIKE (ECF NO. 31) AND MOTION FOR SUMMARY JUDGMENT (ECF NO. 18)**

Plaintiff Tara Fortney ("Plaintiff" or "Fortney") brings the instant employment discrimination action against Defendant Great Lakes Wine and Spirit, a Michigan Limited Liability Company ("Defendant" or "GLWS"), pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII") (Count I) and the Elliott-Larsen Civil Rights Act, MCL § 37.2101 *et seq*. ("ELCRA") (Count II). *See generally* ECF No. 1. Plaintiff alleges that GLWS retaliated against her for engaging in the protected activity of reporting inappropriate harassment by a GLWS executive against her and other female employees. *Id.* at PageID.8-9. Before the Court are Defendant's Motion for Summary Judgment (the "Summary Judgment Motion") pursuant to Fed. R. Civ. P. 56 and Defendant's Motion to Strike Plaintiff's

Surreptitious Recordings and Transcripts as Exhibits to Plaintiff's Response to Defendant's Motion for Summary Judgment (the "Motion to Strike"). ECF Nos. 18, 31. The parties adequately briefed the Motions, and the Court will rule without a hearing. *See* ECF Nos. 18, 27, 30, 31, 34, 35; *see also* E.D. Mich. LR 7.1(f)(2).

For the reasons explained below, Defendant's Motion to Strike (ECF No. 31) and Motion for Summary Judgment (ECF No. 18) are **DENIED**. Further, the Court finds that genuine disputes of material fact exist and a trier of fact must determine: (1) whether there is a causal connection between Plaintiff's protected activity and her demotion; and (2) whether Defendant's proffered reason for the demotion — poor leadership and undermining an important new company initiative — was manufactured pretext.

## I.

At the heart of this action are competing allegations regarding whether GLWS retaliated against Fortney in violation of Title VII and ELCRA when it moved Fortney to a different position after she reported alleged discriminatory harassment by another employee. GLWS claims that Fortney was moved because "her managers lost confidence in her ability to support the company's acquisition of another wine company . . . and her capability to lead her team to do the same." ECF No. 18, PageID.113. Fortney claims she was demoted and had her supervisory responsibilities taken away because she reported retaliation and other inappropriate

actions by Vice President of Sales Development Rick Lopus. ECF No. 27, PageID.1083; ECF No. 19-1, PageID.814.

## A. General Background: Plaintiff's Employment History at GLWS

GLWS is a Michigan-based alcohol beverage wholesale business serving all 83 counties in the state. ECF No. 18-2, PageID.147. Fortney began working at GLWS in April 2013 as an On Premise District Manager and was subsequently promoted to On Premise / Fine Wine Area Manager. ECF No. 18-5, PageID.319; ECF No. 19-1, PageID.815.[1] As an Area Manager, Fortney reported directly to On Premise / Fine Wine Sales Director Josh Brooks ("Brooks"); she was responsible for accomplishing "sales and account objectives through the management of District Managers and Sales Consultants[] servicing customers on premise." ECF No. 19-1, PageID.815; ECF No. 18-7, PageID.486. A group of approximately twenty people, including District Managers and their Sales Consultants, reported directly to Plaintiff. ECF No. 27-6, PageID.1461.

GLWS expected Fortney to demonstrate strong leadership skills and maintain "command of [her] team" in executing "all company goals, functions, and responsibilities . . . in their area." ECF No. 18-7, PageID.486. Within GLWS's organizational chain: Fortney reported to Brooks, Brooks reported to Vice President

[1] "On premise" refers to products that are "consumed in the same place [they are] purchased, i.e., restaurants, bars, etc." ECF No. 18, PageID.113.

Brandon Jacobs ("Jacobs"), and Executive Vice President Jason Howard ("Howard") was above them. ECF No. 19-1, PageID.815. Rick Lopus was a Vice President of Sales but was not Fortney's direct supervisor. *Id.* In September 2024, GLWS transferred Fortney to the role of On Premise Brand Development Manager, citing her alleged "poor leadership related to the launch of the Fox Fine Wine division"; she remains in that position today. ECF No. 18-13, PageID.790; ECF No. 18-6, PageID.352.

**B. GLWS Launches the Fox Wine Initiative in Early 2024**

In early 2024, GLWS acquired Henry Fox Fine Wine ("Fox"), which became a division of GLWS. ECF No. 27-1, PageID.1232. The integration contemplated that GLWS and Fox sales representatives would work within some of the same customer accounts, with the objective of increasing the exposure and availability of the companies' products. *See* ECF No. 18, PageID.115-116. Howard, Lopus, and Jacobs participated in determining which Fox representatives would work within existing GLWS accounts. *Id.* Although GLWS began preparing for the acquisition before then, Howard testified that the Fox Initiative formally launched in April 2024. ECF No. 27-4, PageID.1345. The transition generated friction before the formal launch. On February 14, 2024, Carl Boehm ("Boehm"), then a GLWS District Manager, emailed Howard and Jacobs concerning a conversation between Lopus and Kristine Howe ("Howe"), a sales representative on Fortney's team. ECF No.

27-5, PageID.1401-1402. According to Boehm, Lopus had told Howe that she was not going to do well under the upcoming changes involving Fox. *Id.* Boehm expressed frustration that Lopus had discussed information concerning the acquisition that Boehm understood to be confidential. *Id.*

On March 7, 2024, Howard met with GLWS sales managers to explain the company's expectations for the Fox integration. ECF No. 27-4, PageID.1336. Howard testified that management was expected, among other things, not to undermine other sales representatives, to effectively manage change, to understand and support the Fox Initiative, to approach the transition from a "total company" perspective, and to work empathetically and collaboratively with Fox personnel. ECF No. 27-4, PageID.1356-1357. Howard again addressed the Fox Initiative at a July 19 on-premise meeting, emphasizing that GLWS employees were expected to support Fox, continue selling the wines assigned to their accounts, and work with their Fox counterparts. ECF No. 27-4, PageID.1355-1357; ECF No. 27-6, PageID.1458.

### C. Plaintiff's Alleged Performance Issues

According to Howard, Fortney expressed skepticism as early as January 2024 about whether the Fox model would work in the on-premise environment. ECF No. 27-4, PageID.1334-1335. Howard also testified that a GLWS customer later told him Fortney was unhappy with the Fox Initiative and had expressed dislike of Fox

manager Peter Woods ("Woods") to a restaurant owner. *Id.* Fortney points out, however, that on January 25, 2024, the same general period in which Howard says she expressed skepticism, Howard emailed her that it had been a "good day" and instructed her to "[k]eep up the work," without criticizing her support for Fox. ECF No. 27-14, PageID.1681.

In April 2024, Jacobs convened a meeting of the on-premise leadership team after management received reports that members of Fortney's team were undermining the Fox Initiative. *See* ECF No. 27-6, PageID.1412-1413. The concerns included allegations that Howe had approached a restaurant buyer before Woods could do so, after which the buyer declined to purchase Fox wine; that sales representative Caroline Lamb ("Lamb") failed to advise a customer that Fox carried a wine Lamb herself did not carry; and that Fortney delayed assisting Woods with GLWS's internal systems. *See* ECF No. 27-6, PageID.1416-1417; ECF No. 18, PageID.118. Management also objected to references to Fox representatives as "competition" and, according to GLWS, made clear that conduct undermining the Fox Initiative would not be tolerated. *See* ECF No. 18, PageID.118-119.

GLWS later characterized Fortney's conduct relating to Peter Woods' training as a "refusal to assist in training Peter Woods on GLWS management tools." ECF No. 27-11, PageID.1675. The underlying email exchange reflects that Fortney asked for additional time rather than stating that she would not assist Woods. *See* ECF No.

27-15, PageID.1682-1684. Brooks likewise testified that Fortney was asking for "a little more time," rather than refusing altogether, and Brooks ultimately arranged for the training to occur through someone else. ECF No. 27-3, PageID.1272-1273; *see also* ECF No. 27-16, PageID.1685. Howard testified that his information that Fortney had "refused" to train Woods came from Lopus. ECF No. 27-4, PageID.1350.

The parties also dispute the significance of Fortney's use of the term "competition." Fortney acknowledged that, during the August 15 meeting discussed below, she referred to Fox representatives as competition for her own sales representatives. ECF No. 27-1, PageID.1173. But the record also reflects that other GLWS employees used similar terminology. During a March 22 meeting, another employee referred to Fox as "competitors," and Jacobs agreed that his response was effectively an acknowledgment of that characterization; neither Jacobs nor that employee was transferred as a result. ECF No. 27-6, PageID.1463-1464. Howe also testified that Brooks later referred to Fox as "the competition" during a June meeting. ECF No. 27-17, PageID.1690. GLWS further contends that Fortney indicated she could not control the activities of commissioned sales representatives on her team. ECF No. 27-11, PageID.1675. Jacobs recalled Fortney making statements to that effect in April and June 2024. ECF No. 27-6, PageID.1458-1459. Howard also identified the issue as arising during the August 15 meeting. ECF No. 27-4,

PageID.1351-1352. Fortney disputes GLWS's characterization of the discussion, and the record reflects at least some discussion concerning the practical extent to which commissioned representatives could be required to take particular actions in individual customer accounts. *See* ECF No. 27, PageID.1090.

Another stated concern was that Fortney "undermin[ed] the Fox Fine Wine initiative through continued objections and questioning of the new division in meetings and in front of co-workers." ECF No. 27-11, PageID.1675. Howard testified that his understanding that Fortney continued to undermine the Fox Initiative was based, at least in part, on information from Brooks. ECF No. 27-4, PageID.1354. Brooks, however, testified that he was "not familiar with" the specific allegation as phrased in GLWS's September 6 memorandum, although he agreed that Fortney questioned the Fox Initiative. ECF No. 27-3, PageID.1274. Brooks also testified that Fortney asked him for clarification regarding GLWS's expectations, but that asking for clarification was not itself a problem for him. ECF No. 27-3, PageID.1276.

GLWS also attributed its dissatisfaction with Fortney to customer resistance to Fox representatives. The September 6 memorandum states that an "inordinate number" of accounts in Fortney's area were refusing to work with Fox compared with the rest of the company. ECF No. 27-11, PageID.1675. Howard identified three accounts that he associated with that concern, but he did not personally

interview those accounts regarding whether Fortney had caused or encouraged their resistance. ECF No. 27-4, PageID.1346-1347. Howard further testified that some information concerning customer resistance came from Lopus. *Id.* Jacobs, meanwhile, could not identify who made the comparative characterization contained in the September 6 memorandum and did not recall conducting the comparison between Fortney's area and other areas that the statement appears to contemplate. ECF No. 27-6, PageID.1452, 1455.

Finally, GLWS relied on Fox sales data in Fortney's area. Howard testified that his conclusion that Fortney's Fox trends were "dramatically worse" than elsewhere in the company was based in part on a DIVER report generated by Jacobs. ECF No. 27-4, PageID.1342-1343; ECF No. 27-6, PageID.1450. The report did not specify a date range, and Jacobs testified that the data could have begun as early as January 2024, several months before the Fox Initiative formally launched. ECF No. 27-6, PageID.1450. Howard further testified that the report included data from both the Fox Fine Wine I and Fox Fine Wine II books. ECF No. 27-4, PageID.1345. Fortney states that, in her Area Manager role, she never controlled or represented the Fox Fine Wine I book. ECF No. 27-13, PageID.1678, ¶ 9.

At his deposition, Jacobs was presented with several circumstances that Fortney contends affected the sales comparison, including year-over-year customer purchasing patterns and one-time purchases. ECF No. 27-6, PageID.1452-1453.

When asked whether, in light of those circumstances, he still stood by the statement that Fox trends in Fortney's area were "dramatically worse" than the rest of the company, Jacobs answered: "[w]ith a lot of unknown, I'd have to look at it." *Id.* Howard also described the report as reflecting Fortney's team "flipping out wine pours" or taking business from Fox, while Jacobs had previously acknowledged that some "steal share" was expected during the early implementation of the Fox Initiative. ECF No. 27-4, PageID.1339; ECF No. 27-6, PageID.1411-1412.

Despite those Fox-related concerns, Brooks testified that Fortney's overall performance as an Area Manager remained in line with GLWS's expectations and that her team met its targets. ECF No. 27-3, PageID.1245-1246. The parties' competing accounts of Fortney's support for the Fox Initiative came to a head during an August 15, 2024 meeting attended by Fortney, Howard, Jacobs, Brooks, and Vice President of Human Resources Stephanie Lyons ("Lyons"). ECF No. 27-8, PageID.1525. GLWS contends that Fortney's statements during that meeting confirmed management's concerns regarding her leadership and support for Fox. ECF No. 18, PageID.124. Howard testified that, after the August 15 meeting, he "[m]ade the decision that changes needed to be made." ECF No. 27-4, PageID.1326. The meeting, however, was also convened to address Fortney's reports concerning Lopus and Howe.

### D. Plaintiff's Reports Concerning Lopus and Alleged Retaliation by GLWS

GLWS emphasizes that Fortney had previously viewed Lopus as a mentor, confidant, and friend. *See* ECF No. 18, PageID.121. Their relationship changed as Fortney began reporting concerns about Lopus's treatment of female employees. *Id.* On June 6, 2024, after speaking with Lopus, Fortney called Jacobs and reported that Lopus had referred to Howe as a "bitch" in connection with an account decision. ECF No. 27-6, PageID.1419. Fortney testified that Lopus asked whether she had received an email from Boehm and, after Fortney responded, said words to the effect of "that bitch isn't getting the account." *See* ECF No. 27, PageID.1084. On June 17, Fortney provided Lyons with a written statement concerning Lopus, and on June 20 she reported another alleged instance of sexual harassment involving him. *See* ECF No. 27, PageID.1084; ECF No. 27-8, PageID.1516-1517.

The reports continued into August. On August 15, Howard, Jacobs, Brooks, Lyons, and Fortney met concerning the ongoing dispute involving Lopus and Howe. ECF No. 27-8, PageID.1525. Shortly before that meeting, Fortney provided management with a timeline documenting events involving the two employees. *See* ECF No. 27-1, PageID.1156-1157. The timeline characterized the connection between Lopus's "bitch" comment and the account decision as "clearly retaliation." *See* ECF No. 28-4, PageID.1957. Lyons testified that this was the first time she recalled Fortney expressly reporting that Lopus was retaliating against Howe. ECF

No. 27-8, PageID.1506. On August 21, after Boehm informed Fortney of another alleged incident involving Lopus and a woman, Fortney submitted another written report concerning Lopus. ECF No. 27-1, PageID.1184-1185; *see also* ECF No. 27, PageID.1085. Lyons testified that the August 21 report contained new information, opened the email that day, and forwarded it to Howard. ECF No. 27-8, PageID.1530-1531. GLWS maintains that the process of removing Fortney from her Area Manager role was already underway by then; Fortney disputes when the decision became final.

The parties also dispute the adequacy of GLWS's investigation into Fortney's reports. Lyons testified that she did not open an investigation file under Fortney's name until after Fortney filed this lawsuit. ECF No. 27-8, PageID.1514, 1548. She further testified that an alleged victim identified by Fortney in June was not interviewed until November 2024, and Plaintiff contends that other identified witnesses were never interviewed. ECF No. 27-8, PageID.1519. GLWS responds that the name assigned to an internal investigation file does not establish whether an investigation actually occurred and maintains that Lyons had already been investigating allegations concerning Lopus before the lawsuit was filed. *See* ECF No. 18-16.

### E. Additional Allegations Regarding Vice President Rick Lopus' Employment History and GLWS's Treatment of Him

Fortney also relies on GLWS's prior treatment of Lopus as important

background information. ECF No. 27, PageID.1093. Cooper testified that Lopus had previously worked for a GLWS predecessor and had been terminated in connection with either "harassment or something sexual" involving a female employee. ECF No. 27-10, PageID.1628-1629. Cooper later rehired him. According to Cooper, the person who had worked directly with Lopus was comfortable with the rehire because Lopus had committed to changing his conduct. ECF No. 27-10, PageID.1629-1630. Lopus, however, testified that before being rehired, he spoke with Cooper and not the other person Cooper referenced. ECF No. 27-9, PageID.1581.

In August 2024, Lopus sent an email in which he stated that he could think of "more odious words" to describe Howe than "bitch." ECF No. 27-21. Howard and Lyons testified that they did not recall responding to that remark. ECF No. 27-4, PageID.1333; ECF No. 27-8, PageID.1529. On September 26, 2024, GLWS provided Lopus with a written counseling or acknowledgment concerning the company's harassment and retaliation policies. *See* ECF No. 27, PageID.1093-1094. GLWS emphasizes that Lopus's earlier termination and rehire occurred many years before the events at issue here and further notes that Lopus himself was removed from responsibilities involving Fox during approximately the same period. *See* ECF No. 30, PageID.2096.

**F. Plaintiff's Demotion to On Premise Brand Development Manager**

The record contains differing accounts concerning precisely when GLWS decided to remove Fortney from the Area Manager position and place her into the Brand Development Manager role. Howard testified that he determined that "changes needed to be made" after the August 15 meeting. ECF No. 27-4, PageID.1326. He then instructed Jacobs and Brooks to think about the meeting and the situation, and the three reconvened on August 19. *Id.* According to Howard, they agreed at that meeting that Fortney would no longer be able to serve as an Area Manager; the final determination that she would move specifically into the Brand Development Manager position occurred sometime after August 19, which Howard later described as "sometime around the 19th." *Id.*

GLWS's interrogatory response states that the reassignment was a "collective decision," with the "final decision" made by Howard and Cooper "on or about August 21, 2024." ECF No. 27-27, PageID.1785. Cooper testified that he believed that response was accurate, although he acknowledged that the ultimate decision could have occurred after August 21. ECF No. 27-10, PageID.1647. Jacobs testified that Howard asked for his thoughts about moving Fortney to another position on a Monday following the August 15 meeting. ECF No. 27-6, PageID.1443. Brooks testified that he provided input during the week before August 26 and that the first conversation he recalled concerning Fortney specifically becoming the On Premise

Brand Development Manager occurred on the Friday before August 27. ECF No. 27-3, PageID.1278-1279. GLWS also relies on an August 19 calendar invitation as corroboration that Howard, Jacobs, and Brooks met that day. *See* ECF No. 18-14, PageID.792.

On August 27, Howard, Jacobs, Brooks, and Lyons met with Fortney and informed her that she would be moved to the newly created On Premise Brand Development Manager position. *See* ECF No. 27, PageID.1086. GLWS formally memorialized the reasons for that decision in a September 6 memorandum. ECF No. 27-11, PageID.1675. The memorandum stated that GLWS believed Fortney had demonstrated "poor leadership related to the launch of the Fox Fine Wine division" and identified seven concerns: Fox sales trends in her area; customer resistance to Fox representatives; the Woods-training issue; Fortney's reference to Fox representatives as competition; continued objections and questioning of the Fox Initiative; her stated need for clarification concerning expectations; and her purported inability to control commissioned sales representatives. *Id.*

The record also reflects that GLWS considered a more severe employment action. Cooper testified that Howard discussed firing Fortney with him and that Cooper opposed doing so. ECF No. 18-3, PageID.210. Cooper explained that GLWS regarded Fortney as a good salesperson and added that firing her "would look like retaliation" and "would look bad." *Id.* Cooper also stated that he did not want

employees who were performing well to "get in any kind of trouble or retaliation because of this initiative." *Id.* GLWS interprets that testimony as evidence that Cooper was attempting to prevent retaliation; Fortney relies on it as circumstantial evidence concerning management's awareness of the retaliatory implications of taking adverse action against her. Fortney claims her responsibilities changed substantially after the reassignment; she went from supervising approximately twenty employees to having no direct reports. ECF No. 27-6, PageID.1461. Her new role focuses principally on Gallo, an outside supplier. Fortney testified that Gallo is the only outside company with which she works in that position and that she nevertheless was excluded from Gallo meetings for approximately six months after assuming the role. ECF No. 27-1, PageID.1166-1167. She testified that she had to obtain information about those meetings secondhand and was eventually included only after insisting that she needed to attend. *Id.*

Fortney's base salary and benefits remained unchanged, and GLWS maintains that the new position remained bonus eligible. *See* ECF No. 18, PageID.129. The structure of the bonus, however, changed: Howard testified that Fortney's former bonus depended on the performance of the team she supervised, whereas the new position's bonus depends on broader company performance. ECF No. 27-4, PageID.1359-1360. Fortney's September 2024 pay voucher reflects year-to-date gross compensation of $101,374.73, while her September 2025 voucher reflects

year-to-date gross compensation of $85,643.39. ECF No. 27-22, PageID.1766; ECF No. 27-23, PageID.1767. The reassignment also expanded Fortney's travel territory. As an Area Manager, Fortney testified that her work travel was confined to Metro Detroit; in the new position, she is responsible for accounts throughout Michigan. ECF No. 27-1, PageID.1169; ECF No. 27-13, PageID.1679. Fortney states that the statewide travel obligations interfere with her responsibilities as a foster parent and that she has been scheduled for overnight travel. ECF No. 27-13, PageID.1679. GLWS responds that, during her first year in the role, Fortney traveled outside Detroit only five times, returned home the same day each time, and had not yet completed an overnight trip. ECF No. 30, PageID.2095.

As a result of her termination, Fortney filed the instant civil lawsuit against GLWS. She alleges retaliation in violation of Title VII, 42 U.S.C. § 2000e et seq. (Count I), and ELCRA, MCL § 37.2101 *et seq*. (Count II). *See* ECF No. 1. GLWS has moved for summary judgment on all Counts. ECF No. 18.

**II.**

A motion for summary judgment under Federal Rule of Civil Procedure 56 shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where the movant satisfies its initial burden, the nonmoving party must identify specific record evidence showing a genuine dispute of material fact, as the

Court determines the existence of such a dispute by evaluating the record as a whole. *Green Genie, Inc. v. City of Detroit, Mich.*, 63 F.4th 521, 526 (6th Cir. 2023) ("[T]he nonmoving party must present 'significant probative evidence' revealing that there is 'more than some metaphysical doubt as to the material facts necessitating a trial[.]'") (Citation modified). "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts[,]" otherwise, the court need not accept a version of facts that the record disproves. *Scott v. Harris*, 550 U.S. 372, 380-381 (2007). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"The non-moving party may not rely on [her] pleadings alone, but must demonstrate the existence of a genuine issue for trial by pointing to 'specific facts' that create such an issue." *Hamilton v. Myers*, 281 F.3d 520, 525 (6th Cir. 2002) (citation omitted). Courts will find that a genuine dispute of material fact exists where the record reveals "disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A mere scintilla of evidence" is insufficient to forestall summary judgment." *Babcock & Wilcox Co. v. Cormetech, Inc.*, 848 F.3d 754, 758 (6th Cir. 2017). However, the court is under no obligation to parse a summary judgment

record to search out facts or evidence not brought to its attention. *In re Morris*, 260 F.3d 654 (6th Cir. 2001).

> It is the obligation of the non-moving party . . . not the Court, to scour the record in search of the evidence that would defeat a motion for summary judgment: Rule 56 requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986) (citation modified). Moreover, conclusory assertions, supported only by the plaintiff's own opinions, do not create a genuine issue of material fact that can withstand a motion for summary judgment. *Arendale v. City of Memphis*, 519 F.3d 587, 608 (6th Cir. 2008); *see also Johari v. Big Easy Rest., Inc.*, 78 F. App'x 546, 548 (6th Cir. 2003).

**III.**

Defendant has filed two separate but related motions with the Court. First, Defendant moved for summary judgment on Plaintiff's claim of retaliation. ECF No. 18. In response to that motion, Plaintiff submitted certain sealed recordings (and corresponding transcripts) in support of her briefing. *See generally* ECF Nos. 22, 23, 28; *see also* Feb. 9, 2026 Text-Only Notice of Receipt of Media Files. Plaintiff then filed a motion to strike the surreptitious recordings and transcripts. ECF No. 31. Because resolution of the motion to strike necessarily affects the Court's consideration of the motion for summary judgment, the Court will address the motion to strike first and then move to the merits of the summary judgment motion.

### A. Defendant's Motion to Strike

After Fortney filed her Response to GLWS's Motion for Summary Judgment, GLWS moved to strike or otherwise exclude four audio recordings and their corresponding transcripts: Exhibits H and H.1, O and O.1, Y and Y.1, and FF and FF.1. *See* ECF No. 31. *See also* ECF Nos. 28-2, 28-6, 28-7, 28-8. At a high level, the recordings concern several events that also appear elsewhere in the summary-judgment record. Exhibit H is a recording of a March 22, 2024 GLWS meeting concerning the Fox Fine Wine Initiative, which Fortney cites in connection with evidence that GLWS personnel themselves referred to Fox representatives as "competitors." ECF No. 27, PageID.1084. Exhibit FF records an August 14, 2024 telephone conversation between Fortney and Human Resources Vice President Stephanie Lyons regarding, among other things, Fortney's concerns about retaliation and reporting matters to HR. *Id.* at PageID.1094. Exhibit Y records the August 15, 2024 meeting among Fortney, Howard, Jacobs, Brooks, and Lyons that addressed both Fortney's concerns regarding Lopus and Howe and management's concerns regarding Fortney's handling of the Fox Initiative; Fortney relies on the recording in disputing GLWS's characterization that she stated she could not control her sales representatives. *Id.* at PageID.1090-1091. And Exhibit O records the August 27, 2024 meeting at which GLWS informed Fortney that she would be moved to the On-Premise Brand Development Manager position. *Id.* at PageID.1087.

GLWS seeks wholesale exclusion of the four recordings and their transcripts on three grounds: that the recordings are not properly authenticated, that they contain inadmissible hearsay, and that the transcripts were prepared by Fortney rather than a certified court reporter. ECF No. 31, PageID.2108-2110. Fortney responds that she authenticated each recording through a sworn declaration identifying herself as both the recorder and a participant in the conversations, that other deponents likewise identified voices appearing on the recordings, and that GLWS fails to identify any particular statement that constitutes inadmissible hearsay or any specific inaccuracy in the transcripts. ECF No. 34, PageID.2124-2131. The Court will now turn to address Defendant's challenges to the recordings.[2]

**1. The Court Will Not Strike Defendant's Motion**

Plaintiff asks this Court to strike Defendant's Motion to Strike, arguing that Defendant's Motion improperly attempts to circumvent the page limitations applicable to its summary-judgment reply. ECF No. 34, PageID.2133. Essentially, Plaintiff claims that Defendant's Motion to Strike includes arguments that should have been included in Defendant's reply brief in support of its summary judgment motion. *Id.* By considering the motion to strike, Plaintiff argues that Defendant is

---

[2] As an initial matter, Fortney contends that GLWS' references to the recordings and transcripts as "surreptitious" are irrelevant and improper because the recordings at issue were not made unlawfully under Michigan law. ECF No. 34, PageID.2135. Because the Motion to Strike does not argue that the recordings are inadmissible because they were unlawfully obtained, the Court need not address that issue today.

improperly asserting additional arguments that should have been previously raised. The Court is not persuaded because the filing of the Motion to Strike itself afforded Plaintiff a full opportunity to respond to Defendant's evidentiary objections. *See generally id.* Plaintiff identifies no resulting prejudice warranting denial of the Motion on that basis alone. Accordingly, the Court will turn to its evaluation of the Motion to Strike on the merits under Fed. R. Civ. P. 56(c) and Federal Rules of Evidence ("FRE") 801, 802, and 901.

**2. The Recordings and Corresponding Transcripts Are Properly Authenticated**

GLWS argues that the recordings and corresponding transcripts should be excluded because they are not properly authenticated for purposes of summary judgment. ECF No. 31, PageID.2109. Defendant contends that Plaintiff cannot establish a sufficient chain of custody and offered no expert analysis confirming that the recordings are complete, unaltered, and untampered with. *Id.* at PageID.2110. Fortney counters that the recordings are sufficiently authenticated through her sworn declaration identifying each recording, the date it was made, and confirming that she made the recording, participated in the conversation, and submitted a true and accurate copy. ECF No. 34, PageID.2127. She also points to deposition testimony in which she was questioned about the recordings' authenticity and chain of custody, as well as testimony from other witnesses identifying voices on the recordings. *Id.*

Defendant further argues that the transcripts are especially unreliable because Plaintiff, an interested party, prepared them rather than having a court reporter prepare or certify them. ECF No. 31, PageID.2110. On that basis, Defendant maintains that neither the recordings nor the transcripts satisfy the evidentiary requirements for consideration under Rule 56. *Id.* at PageID.2109. Fortney contends that Rule 901 imposes only a low threshold for authentication and does not require expert analysis nor transcription by a court reporter to establish that a recording is complete or unaltered. ECF No. 34, PageID.2126. She further argues that GLWS's authentication challenge is conclusory and unsupported by authority. *Id.* at PageID.2127. The Court agrees.

The Eastern District's Electronic Filing Policies and Procedures require a party filing a media exhibit to transcribe all audible portions of the recording and file the transcript as an exhibit. *See* E.D. Mich. Electronic Filing Policies and Procedures R19(c); *see also Lambert v. City of Saginaw*, No. 21-12929, 2023 WL 3168667, at *1 (E.D. Mich. Apr. 28, 2023) (quoting R19(c)). The rule does not require a court reporter to prepare or certify such a transcript. *Id.* Nor does Rule 901 require independent expert authentication of an audio recording.

> Federal Rule of Evidence 901(a) requires a proponent of evidence to produce proof sufficient to support a finding that the item is what the proponent claims it is. Rule 901(b) in turn provides a nonexhaustive list of means by which to authenticate evidence. Authenticating evidence can be accomplished in a number of ways—with testimony from someone with knowledge of the evidence offered, for example, or by

> pointing to distinctive characteristics that establish authenticity. The burden of proof for authentication is slight. There need be only a prima facie showing, to the court, of authenticity, not a full argument on admissibility.

*U.S. v. Didani*, No. 21-20264, 2025 WL 452472, at *3 (E.D. Mich. Feb. 10, 2025) (citing Fed. R. Evid. 901(a), (b); *United States v. Farrad*, 895 F.3d 859, 876 (6th Cir. 2018) (citation modified)). Here, Fortney stated under penalty of perjury that she made the challenged recordings, participated in the conversations, and that the submitted recordings are true and accurate copies. *See* ECF No. 27-7. That showing is sufficient to satisfy Rule 901's threshold authentication requirement.

In the Sixth Circuit, a transcript may be used where its accuracy is adequately established; if the parties dispute its accuracy, the Court may compare it against the underlying recording. *See United States v. King*, 272 F.3d 366 (6th Cir. 2001); *see also United States v. Braxton*, No. 20-1491, 2022 WL 910571, at *2-3 (6th Cir. Mar. 29, 2022) (finding that audio recording transcripts were admissible at trial where they "fairly reflected the audible portions of the recorded calls and indicated where the audio was unintelligible[]"); *Barens v. Parma City Sch. Dist.*, No. 1:22CV00103, 2025 WL 834412, at *20 (N.D. Ohio Mar. 17, 2025) (citing *Braxton*, 2022 WL 910571 at * 2-3). Thus, the accompanying transcripts do not give rise to an inquiry into whether they needed to be independently transcribed and certified by a court reporter. Rather, they may raise a distinct accuracy question, but the Court finds no reason to question their accuracy here.

GLWS's reply to the Summary Judgment Motion fails to further develop its contention that Fortney's declaration is insufficient to satisfy Rule 901's threshold authentication requirement, that her certification runs afoul of this Court's transcript certification standards, or that any specific portion of the challenged recordings or transcripts contains inaccuracies. Indeed, Defendant's cursory assertions of potential inauthenticity and inaccuracy appear disingenuous given its affirmative reliance on the recording of the August 15 meeting in its own summary-judgment reply. ECF No. 34, PageID.2132. Defendant cited several timestamps from the recording for propositions it independently advanced regarding Plaintiff allegedly "challenging the [Fox] Initiative five months after it had launched despite leadership's clear direction for them to act as one team." ECF No. 30, PageID.2099 (citing ECF No. 27-Y, 00:38:28-00:45:50, 00:46:09-00:46:35, 00:51:11-00:51:25, 2:06:53-2:07:21, 02:09:02-02:09:40). Having used the recording of the August 15 Meeting the as evidentiary support without objecting to its admissibility in that context, GLWS's later request to exclude it is difficult to reconcile with its own treatment of the exhibit. Defendant failed to address this inconsistency in its reply to the Motion to Strike.

In any event, the Court has reviewed the challenged recordings, the corresponding transcripts, and Fortney's supporting declarations. Having done so, the Court is satisfied that the recordings have been sufficiently authenticated and that

the transcripts accurately reflect the audible portions of the recordings relevant here. As the Court will explain next, its findings further establish that the Court may consider the pertinent statements of GLWS employees at summary judgment as opposing-party statements under Fed. R. Evid. 801(d)(2)(D).

### 3. The Recordings and Transcripts Fall Under the Opposing Party Statement Exception to the Rule Against Hearsay

Hearsay is generally inadmissible unless a federal statute, the Federal Rules of Evidence, or another rule prescribed by the Supreme Court provides otherwise. Fed. R. Evid. 802. But a statement is not hearsay when it is offered against an opposing party and "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D). GLWS argues that the recordings and transcripts contain inadmissible hearsay because they consist of out-of-court statements offered for the truth of the matters asserted. ECF No. 31, PageID.2110. It relies on Rules 801 and 802, contending that Fortney has not shown the challenged statements could be presented in admissible form at trial. *Id.* Fortney responds that GLWS never identifies any specific statement in the recordings that allegedly constitutes inadmissible hearsay and therefore improperly seeks wholesale exclusion. ECF No. 34, PageID.2128-2129. She further argues that the relevant statements were made by GLWS employees and managers during work-related meetings concerning company business and personnel matters, and thus fall within Rule 801(d)(2)(D)'s exclusion for opposing-

party statements made by an employee on a matter within the scope of the employment relationship. *Id.* at PageID.2129.

GLWS devotes much of its Reply to arguing that, notwithstanding the self-selected title of its filing, the Motion to Strike is more properly characterized as a motion to exclude and not an improper attempt to circumvent the length restrictions for its Summary Judgment Brief. It does not, however, respond to Fortney's argument that the relevant statements of GLWS employees are non-hearsay under Federal Rule of Evidence 801(d)(2)(D).

As Plaintiff aptly noted, "statements made by a party's agent or employee 'on a matter within the scope of that relationship and while it existed' are not inadmissible hearsay." *See* ECF No. 34, PageID.2129 (citing Fed. R. Evid. 801(d)(2)(D)); *see also Giron v. Tyco Elecs. Corp.*, 762 F. App'x 233, 239 (6th Cir. 2019) (finding that statements made by defendant's employee regarding how they "thought or felt about [plaintiff's] performance, behavior, office relations, workplace atmosphere" were within the scope of employment and admissible). The recordings at issue were clearly created during meetings and phone calls between GLWS employees regarding work-related matters. *See* ECF Nos. 28-2, 28-6, 28-7, 28-8. Fortney is therefore correct that GLWS's generalized objections to the recordings and corresponding transcripts are largely conclusory and not properly supported by governing authority. And the Court is not required "to sift through the record in

search of evidence or argument in support of a party's position." *Varlesi v. Wayne State Univ.*, No. 10-14793, 2014 WL 2864690, at *8 (E.D. Mich. June 24, 2014), *aff'd,* 643 F. App'x 507 (6th Cir. 2016). Accordingly, the Court declines to strike or otherwise exclude any of the recordings or transcripts at issue. Defendant's Motion to strike (ECF No. 31) is therefore **DENIED**. The Court will now turn to consider GLWS's Summary Judgment Motion.

**B. Defendant's Motion for Summary Judgment**

Fortney claims GLWS retaliated against her in violation of Title VII and ELCRA by demoting her for engaging in protected activity. ECF No. 1, PageID.8-9. A plaintiff may rely on either direct evidence or indirect evidence to support her retaliation claims. *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 613 (6th Cir. 2019). Where, as here, the plaintiff relies on circumstantial evidence, the Court evaluates her claims using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

**1. *McDonnell Douglas* Burden Shifting Framework**

Under the first step of the burden-shifting framework, plaintiff must establish a *prima facie* case of discrimination or retaliation. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014); *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000). To meet the *prima facie* threshold for retaliation under Title VII and ELCRA, Fortney

must demonstrate that: (1) she engaged in protected activity, (2) GLWS had knowledge of the protected activity, (3) GLWS "took an action that was 'materially adverse' to the plaintiff," and (4) there is a causal connection between the plaintiff's protected activity and the defendant's adverse action. *Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 343-344 (6th Cir. 2021); *see also Jones v. Johanns*, 264 F. App'x 463, 466 (6th Cir. 2007)) (explaining the *prima face* burden under Title VII); *El-Khalil v. Oakwood Healthcare, Inc.*, 504 Mich. 152, 160-161, 934 N.W.2d 665 (Mich. 2019) (per curiam) (explaining the *prima facie* burden under ELCRA).

While the burden of production shifts between the parties, the burden of persuasion remains with the plaintiff throughout the process. *Laster,* 746 F.3d at 730 (citing *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007)). If the plaintiff successfully establishes her *prima facie* case, the burden of production then shifts to the employer to offer a "legitimate, non-discriminatory or retaliatory reason" for the adverse employment action. *Johnson*, 215 F.3d at 573. The burden then shifts back to the plaintiff to show that the employer's proffered reason is pretextual. *Laster,* 746 F.3d at 730. A plaintiff may establish pretext by showing that the employer's proffered reason: (1) had no basis in fact, (2) did not actually motivate the employer's actions, or (3) was insufficient to motivate the employer's action. *See Miles v. South Cen. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020). Although plaintiffs are not confined to these three categories, they must still

articulate how the evidence they rely upon supports a reasonable inference that the employer's proffered reason was not the true reason for the adverse action. *Id.* The ultimate inquiry remains whether the employer acted for the stated reason or if that reason was pretextual. *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012).

The Court must ensure that the burden-shifting framework does not obscure the dispositive question at summary judgment: "whether the record contains a genuine dispute of material fact requiring resolution by a jury." *See Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 776 (6th Cir. 2016) (citing *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 813 (6th Cir. 2011)); *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000). For purposes of the Summary Judgment Motion, GLWS does not seek summary judgment based on the first two elements; rather, Defendant challenges Fortney's ability to establish an adverse action, a causal connection, and pretext. *See generally* ECF No. 18. The Court will begin its analysis by evaluating whether GLWS's decision to remove plaintiff from the role of Area Manager constituted an adverse employment action.

**2. Fortney Established That Her Demotion Was an Adverse Employment Action as a Matter of Law**

The third *prima facie* element requires Fortney to show that GLWS subjected her to a materially adverse action. *Genesee Cnty. Rd. Comm'n*, 999 F.3d at 343-344. Plaintiff claims she suffered an adverse action when she was demoted from Area

Manager to an "on-premise" specialist position after reporting Lopus to management and HR multiple times for sexual harassment and gender discrimination against female GLWS employees. ECF No. 1, PageID.3-7. According to Plaintiff's Complaint, her new position "resulted in a nearly $40,000 reduction in pay, and required 30 percent [more] [sic] travel." *Id.* at 7. Plaintiff further alleged that the increased travel was especially burdensome and that she had to decline "many bonus trips related to her exemplary work performance at GLWS" because they conflicted with her known duties as a foster parent. *Id.*

An action is materially adverse if, viewed objectively and in context, it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006); *Laster*, 746 F.3d at 719 (6th Cir. 2014). The retaliation standard is therefore broader than the standard governing substantive discrimination claims and is not limited to actions affecting the terms or conditions of employment; nevertheless, it excludes trivial harms, petty slights, and minor annoyances. *Burlington*, 548 U.S. at 64, 68. Because the significance of an employer's action depends on the circumstances, courts must assess whether an action is materially adverse in context, from the perspective of a reasonable employee. *Id.* at 69. Michigan courts apply the same *Burlington* reasonable-employee standard to retaliation claims under the ELCRA. *White v. Dep't of Transp.*, 334 Mich. App. 98, 120-21, 964 N.W.2d 88 (2020).

Defendant's Summary Judgment Motion asks the Court to find that Plaintiff cannot show, as a matter of law, that she suffered an adverse employment action under Title VII and ELCRA. ECF No. 18, PageID.128-129. GLWS argues that Plaintiff cannot establish an adverse action occurred without showing the action was "more disruptive than a mere inconvenience or alteration of job responsibilities." *Id.* at PageID.128. (quoting *Hollins v. Atl. Co.*, 188 F.3d 652, 662 (6th Cir. 1999)). GLWS asserts that Plaintiff cannot meet this burden because her new position offered the same base salary and benefits, provided greater bonus eligibility, and did not require overnight travel. *Id.* at 129. Defendant further contends that Fortney's reliance on pay vouchers from September 2024 and September 2025 is inaccurate because the vouchers reflect reimbursements of out-of-pocket expenses and do not constitute income. *Id.*; ECF No. 18-6, PageID.798.

Defendant is not incorrect that the above-described circumstances standing alone may not amount to an adverse action. Nonetheless, Plaintiff introduces additional facts showing she was subject to an adverse employment decision as a matter of law. Most significantly, Fortney went from supervising approximately 20 employees as an Area Manager to having no direct reports in her new position. ECF No. 27-6, PageID.1461. Courts applying *Burlington* have recognized that eliminating an employee's supervisory responsibilities can constitute a materially adverse action even where salary and benefits remain unchanged. *See Edmonds v.*

*Tenn. Dep't of Prob. & Parole*, 386 F. App'x 507, 513-514 (6th Cir. 2010) (noting that the removal of supervisory duties qualified as an adverse action under *Burlington*); *Howard v. Pearl Interactive Network, Inc.*, No. 5:16-CV-362-REW, 2018 WL 3732668, at *8 (E.D. Ky. Aug. 6, 2018) (concluding that an employee's change from overseeing twelve supervisors to having no direct reports objectively altered his position in a material way). Here, the change was not merely titular: Fortney lost all supervisory authority and assumed a materially different role. The record also reflects additional circumstances that materially affected her job responsibilities.

When Fortney traveled for work in her former position, she traveled only within Metro Detroit; now she must travel the entire state and was scheduled to travel overnight during March and April of 2026. ECF No. 27-1, PageID.1169; ECF No. 27-13, PageID.1679. Her exclusion from Gallo meetings likewise supports the conclusion that the reassignment was materially adverse. Fortney testified that Gallo was the only outside company she worked with in her new role. ECF No. 27-1, PageID.1166. Yet, GLWS excluded Fortney from meetings with Gallo from the time she started the position until approximately six months later. *Id.* Fortney had to obtain information about those meetings secondhand from Gallo representatives afterward. *Id.* She also testified that GLWS began including her in meetings with Gallo only after she insisted she needed to attend and that a Gallo representative

similarly expressed displeasure with her exclusion. *Id.* *Burlington* recognizes that exclusion from work-related opportunities may be materially adverse when, in context, it affects professional advancement, and *Laster* treated exclusion from a departmental meeting as part of the circumstances supporting a retaliation claim. *Burlington*, 548 U.S. at 69; *Laster*, 746 F.3d at 722, 731-732.

Moreover, Fortney's retention of the same base salary and continued bonus eligibility does not preclude a finding of material adversity. The Sixth Circuit has held that, even under the narrower adverse-employment-action standard applicable to discrimination claims, uncertainty as to whether an employment action would result in a lower discretionary bonus may itself be sufficient to survive summary judgment. *Goldfaden v. Wyeth Lab'ys, Inc.*, 482 F. App'x 44, 49 (6th Cir. 2012). The pay vouchers show that Fortney's year-to-date gross compensation decreased from $101,374.73 in September 2024 to $85,643.39 in September 2025, including a substantial reduction in her management bonus. *See* ECF No. 27-22, PageID.1766; ECF No. 27-23, PageID.1767. Although the vouchers do not conclusively establish that the total decrease is entirely attributable to the reduction in compensation, the Court may still consider it in determining whether the reassignment was materially adverse. *Laster*, 746 F.3d at 732. Fortney's undisputed loss of supervisory authority, together with the other changes accompanying her reassignment, therefore

exceeds the type of mere inconvenience or altered job responsibility that falls outside *Burlington*'s materially adverse action standard.

Defendant's Reply does not meaningfully undermine the Court's conclusion. *See generally* ECF No. 30. Its characterization of Fortney's new travel obligations as a mere inconvenience overlooks the undisputed change in geographic scope: Fortney went from traveling within a limited Metro Detroit territory to traveling throughout Michigan, a materially different obligation regardless of whether she had yet been required to stay overnight. *See* ECF No. 30, PageID.2095. Nor does Fortney's ability to manage her former local travel, or the fact that she has a husband and adult child, bear on whether substantially expanding the territory she was required to cover made the new position objectively less favorable. Defendant's renewed reimbursement argument likewise does not disturb the compensation evidence because the year-to-date gross pay figures Fortney relies on exclude the separately listed reimbursement categories. *See id.* at PageID.2096; *see also* ECF No. 27-22, PageID.1766; ECF No. 27-23, PageID.1767.

Accordingly, the Court concludes that Fortney has established the third *prima facie* element and turns next to whether she has produced sufficient evidence of a causal connection between her protected activity and the reassignment.

**3. Whether A Causal Connection Exists Between Fortney's Allegations Against Lopus and Her Demotion Is a Question for the Trier of Fact**

The fourth *prima facie* element requires Fortney to establish a causal connection between her protected activity and the adverse action: GLWS's decision to demote her. *Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d at 343-344. To begin, the Court must note that Title VII and ELCRA impose substantially different causation standards. Under Title VII, Fortney must present evidence from which a reasonable jury could find that her protected activity was a "but-for cause" of the adverse action; that is, that the action would not have occurred absent her protected activity. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) (holding that Title VII retaliation requires proof that the protected activity was a but-for cause of the challenged employment action). Under ELCRA, however, Fortney must show that her protected activity was a "significant factor" in GLWS's decision. *Barrett v. Kirtland Cmty. Coll.*, 245 Mich. App. 306, 315, 628 N.W.2d 63 (2001); *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 523 n.2 (6th Cir. 2008) (recognizing the same standard). Because Title VII imposes the more demanding standard, the Court first considers whether Fortney has produced sufficient evidence to create a genuine dispute under that standard. If the evidence is sufficient to create a genuine dispute under Title VII's but-for standard, it necessarily is sufficient under the ELCRA's significant-factor standard. If it is not, however, the Court must separately consider whether Fortney's evidence nevertheless satisfies the ELCRA standard. *See Poplar*

*v. Genesee Cnty. Rd. Comm'n*, No. 24-1903, 2025 WL 1950959, at *9 (6th Cir. July 16, 2025).

Whether protected activity was the but-for cause of an adverse employment action is "highly context-specific." *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448 (6th Cir. 2020) (explaining that whether protected activity was the but-for cause of an adverse action depends on the context in which the action occurred). Temporal proximity alone generally is insufficient to establish causation, and cases in which timing alone carries the plaintiff's burden are rare. *Id.* at 448-449; *Mickey*, 516 F.3d at 525. However, temporal proximity remains relevant and can support a but-for causation finding when accompanied by other evidence from which a retaliatory motive may reasonably be inferred. *Kenney*, 965 F.3d at 448-449; *Poplar*, 2025 WL 1950959, at *9; *Mickey*, 516 F.3d at 525.

GLWS principally argues that the timing of events defeats any inference of causation. ECF No. 18, PageID.130-131. It measures approximately three months between Fortney's June 6, 2024 report concerning Lopus and the August 27 meeting at which she was informed of her reassignment.[3] ECF No. 18, PageID.130-131. GLWS further contends that Fortney's conduct concerning the Fox Initiative during the August 15 meeting constituted an intervening legitimate reason for the decision

[3] GLWS characterizes the relevant protected activity as "calling an employee a 'b—ch.'" ECF No. 18, PageID.130. That misstates Fortney's theory. Fortney does not contend that using the term constituted protected activity; rather, she contends that her reporting to management that Lopus used the term toward Howe was the protected activity.

and that management had already decided to remove Fortney from the Area Manager position before she submitted her August 21 report. *Id.* at PageID.131; ECF No. 18-14, PageID.792; ECF No. 18-9, PageID.524. Thus, GLWS maintains that Fortney cannot rely on the August 21 report to establish the requisite temporal connection because an employer's "'proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality.'" ECF No. 18, PageID.131 (quoting *Reynolds v. Fed. Express Corp.*, 544 F. App'x 611, 615 (6th Cir. 2013)).

That argument, however, treats Fortney's June 6 complaint and August 21 report as the only relevant protected activity. They were not. After her June 6 report, Fortney submitted a written statement to Lyons on June 17 and reported another alleged incident involving Lopus on June 20. ECF No. 28-3, PageID.1950-196; ECF No. 27-8, PageID.1516. More significantly for purposes of causation, Lyons testified that the first time she recalled Fortney expressly reporting that Lopus was retaliating against Howe was in the timeline document Fortney provided in advance of the August 15 meeting. ECF No. 27-8, PageID.1506; ECF No. 28-4, PageID.1957. Fortney's timeline characterized Lopus's conduct surrounding the "bitch" comment and the related account decision as "clearly retaliation," and the August 15 meeting itself concerned the ongoing dispute involving Lopus and Howe. ECF No. 27-8, PageID.1525.

The significance of that timing is further underscored by GLWS's own account of when the decision-making process began. Howard did not testify that he had already decided to remove Fortney from management before August 15. Rather, he testified that he "[m]ade the decision that changes needed to be made after the meeting on the 15th of August." ECF No. 27-4, PageID.1326 (emphasis added). According to Howard, he then instructed Jacobs and Brooks to "think about that meeting and think about the situation," and the three reconvened on August 19, at which point they agreed that Fortney could no longer serve as an Area Manager. *Id.* Howard testified that the final decision to place Fortney in the Brand Development Manager position followed "some point after the 19th," although he subsequently described the timing as "sometime around the 19th." *Id.* Thus, even accepting GLWS's earliest version of the decision timeline, only four days separated Fortney's August 15 protected activity from the meeting at which GLWS says management determined that she could no longer remain an Area Manager.

That sequence also distinguishes this case from GLWS's claim that it was "proceeding along lines previously contemplated." GLWS has produced substantial evidence that management had concerns about Fortney's handling of the Fox Initiative before August 15. But evidence that an employer had preexisting concerns about an employee is not the same as evidence that it had already decided to take the challenged action. On the record presently before the Court, Howard's own

testimony identifies the August 15 meeting as the point after which he decided a change in Fortney's position was necessary. And that same meeting immediately followed Fortney's report that Lopus had retaliated against Howe. Accordingly, even if Fortney's August 21 complaint came too late to cause a decision finalized on August 19, that would foreclose reliance on the August 21 report as a cause of the decision; it would not sever the causal relationship, if any, between the decision and Fortney's earlier protected activity.

Nor is the precise date on which the reassignment became final as clear as GLWS suggests. Defendant's interrogatory response states that the reassignment was a "collective decision," with the "final decision" made by Howard and Cooper "on or about August 21, 2024." ECF No. 27-27, PageID.1785. Cooper testified that he believed that response to be true, while also acknowledging that the decision may have occurred after August 21. ECF No. 27-10, PageID.1647. Brooks also testified that he provided input during the week before August 26 and that the first discussion he recalled about Fortney's placement specifically in the On-Premise Brand Development Manager position occurred on the Friday before August 27. ECF No. 27-3, PageID.1278. The August 19 calendar invitation corroborates that Howard, Jacobs, and Brooks had a meeting scheduled that day, but the invitation does not itself resolve what was decided during that meeting or when the final terms of Fortney's reassignment were settled. The Court need not resolve those

discrepancies, however, because even accepting GLWS's August 19 date for purposes of this Motion, Fortney's August 15 protected activity preceded the decision by only four days.

And temporal proximity is not the only evidence from which Fortney asks the Court to infer causation. Cooper's testimony provides additional context. Cooper testified that Howard discussed firing Fortney with him and that Cooper opposed doing so. ECF No. 18-3, PageID.210. When asked why, Cooper explained in part that GLWS regarded Fortney as a "good salesperson," and added that firing her "would look like retaliation" and "would look bad." *Id*. Cooper further testified that he did not want an employee who was doing a good job to "get in any kind of trouble or retaliation because of this initiative." *Id.* GLWS can reasonably argue that this testimony demonstrates the opposite of retaliatory intent: that Cooper recognized the risk and affirmatively sought to prevent retaliation. But Fortney advances a different permissible inference: that, while management was considering what employment action to take against her, one of the individuals involved in approving that action was expressly concerned that terminating her would appear retaliatory, and GLWS ultimately imposed a materially adverse reassignment instead. Cooper's testimony does not establish retaliatory motive as a matter of fact, but the Court cannot select between those competing reasonable interpretations at summary judgment.

Record evidence also connects Lopus, the very employee whose conduct Fortney repeatedly reported, to information GLWS later relied on to explain the demotion. One of GLWS's proffered reasons for its decision was that Fortney had "refused" to assist with training Woods. ECF No. 18-13, PageID.790. Howard testified that Lopus told him Fortney had refused to do so. ECF No. 18-9, PageID.532. Plaintiff also points to testimony that Lopus provided information regarding another proffered reason: that an inordinate number of accounts in Fortney's area were unwilling to work with Fox representatives. ECF No. 27, PageID.1105-1106; ECF No. 18-9, PageID.529. This occurred against the backdrop of Lopus's July 24 email to Howard and Lyons questioning why Fortney and Howe still worked for GLWS and his August 15 criticism that the two were rejecting the Fox Initiative. ECF Nos. 27-20, 27-21. GLWS responds that this evidence cannot establish "cat's paw" liability because Lopus was not Fortney's supervisor, did not attend the August 19 meeting, and did not make the ultimate decision to reassign her.[4] ECF No. 30, PageID.2096-2097. The Court need not determine, however, whether Fortney can establish liability under a formal cat's-paw theory to decide the narrower question presented here. The relevant point at the *prima facie* stage is that

[4] The "cat's paw theory" of liability is an employment law doctrine in which an employer is held liable for discrimination or retaliation based on an unbiased decision-maker being manipulated by a biased subordinate. *Liebau v. Dykema Gossett, PLLC*, No. 23-1301, 2024 WL 1739750, at *5 (6th Cir. Apr. 23, 2024)

the record permits a finding that Lopus was not wholly removed from the factual basis upon which GLWS acted: he communicated directly with management about Fortney's continued employment and supplied Howard with information underlying at least some of the reasons later given for her removal from management. GLWS is free to establish that Howard independently assessed those facts and would have reached the same decision regardless of Fortney's complaints. But at summary judgment, Lopus's involvement is another piece of circumstantial evidence to be considered together with the timing and the remainder of the record. The Court cannot simply disregard it because he lacked final decision-making authority.

None of this establishes that Fortney's complaints in fact caused her demotion. Evidence supports GLWS's competing account, including that management's concerns about the Fox Initiative arose before Fortney began reporting Lopus and that Howard viewed Fortney's statements and conduct during the August 15 meeting as confirming those concerns. Whether those concerns actually would have resulted in Fortney's removal from the Area Manager position absent her protected activity is precisely what the parties dispute. The Court addresses the substantial factual disputes surrounding GLWS's stated reasons more fully in its pretext analysis below.

Viewed collectively and in Fortney's favor, however, the record is not so one-sided that causation can be resolved as a matter of law. Fortney repeatedly engaged

in protected activity during the months preceding her demotion; she expressly raised retaliation concerning Lopus immediately before the August 15 meeting; GLWS itself identifies that meeting as the event that precipitated Howard's decision to remove her from management; the decision followed within days; Cooper contemporaneously expressed concern that firing Fortney would "look like retaliation"; and Lopus supplied management with information later relied upon to justify the demotion. A reasonable jury could conclude from that evidence that, absent Fortney's protected activity, GLWS would not have demoted her. A reasonable jury could also accept GLWS's explanation that the decision resulted entirely from Fortney's handling of the Fox Initiative. Resolving between those competing explanations requires weighing the evidence and determining what actually motivated GLWS, which are functions reserved for the trier of fact. Because Fortney has produced sufficient evidence to create a genuine dispute under Title VII's more demanding but-for standard, she necessarily satisfies the ELCRA's significant-factor standard for purposes of summary judgment.

Accordingly, Fortney has established her *prima facie* case of retaliation under Title VII and ELCRA. The burden therefore shifts to GLWS to articulate a legitimate, nonretaliatory reason for the demotion. GLWS has done so, contending that management removed Fortney from the Area Manager position because it lost confidence in her ability to lead her team through the Fox Initiative. ECF No. 18,

PageID.113. The Court therefore turns to whether Fortney has produced sufficient evidence from which a reasonable jury could find that those reasons were pretextual.

**4. Whether GLWS Manufactured Pretext to Justify Fortney's Demotion Is a Question for the Trier of Fact**

Once an employer articulates a legitimate, non-retaliatory reason for an adverse employment action, the burden shifts back to the plaintiff to show that the proffered reason was a pretext for retaliation. *Laster*, 746 F.3d at 730. A plaintiff may demonstrate pretext by showing that the employer's stated reason: (1) had no basis in fact; (2) did not actually motivate the adverse action; or (3) was insufficient to motivate the adverse action. *Miles*, 946 F.3d at 888. These categories are not rigid requirements, but rather a "convenient way of marshaling evidence" toward the ultimate inquiry: whether the employer's stated reason was the true reason for the challenged action. *Tingle*, 692 F.3d at 530.

An employer's reason does not become pretextual merely because it was mistaken. When an employer "reasonably and honestly relies on particularized facts in making an employment decision," an employee ordinarily cannot establish pretext simply by showing that the employer reached the wrong conclusion. *Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009). But the employer's belief must be reasonably grounded in the particularized facts before it made the decision—the relevant inquiry is whether the employer made a "reasonably informed and considered decision" before taking the adverse action. *Braithwaite v. Timken Co.*,

258 F.3d 488, 494 (6th Cir. 2001) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)). Thus, although the Court does not second-guess the wisdom of an employer's business decision, neither must it accept an employer's asserted honest belief where the evidence would permit a reasonable jury to reject that explanation. *See Chen*, 580 F.3d at 400-401.

GLWS has satisfied its burden of producing a legitimate, non-retaliatory explanation for Fortney's reassignment. The September 6, 2024 memorandum states that Fortney demonstrated "poor leadership related to the launch of the Fox Fine Wine division" and identifies seven concerns: Fox sales trends in her area; an allegedly disproportionate number of accounts unwilling to work with Fox representatives; her purported refusal to assist with Peter Woods's training; referring to Fox representatives as competition; continued objections to and questioning of the Fox Initiative; continued requests for clarification regarding management's expectations; and her statement that she could not control the activities of her commissioned sales representatives. ECF No. 18, PageID.134; ECF No. 27-11, PageID.1675. GLWS maintains that Howard considered those circumstances cumulatively rather than treating any one incident as independently dispositive. ECF No. 30, PageID.2097-2099.

The record contains evidence supporting portions of that explanation. Fortney acknowledges that she referred to Fox representatives as her sales representatives'

"competition" during the August 15 meeting, and GLWS has identified evidence from which Howard could have viewed Fortney as continuing to resist aspects of the Fox Initiative. ECF No. 30, PageID.2098-2099; ECF No. 27-1, PageID.1173; ECF No. 28-7, PageID.2011-2015, 2017-2018, 2061-2063. The Court therefore does not conclude that GLWS's stated concerns lacked any factual basis. But Fortney's pretext showing does not depend on disproving every underlying event. Rather, she has produced evidence calling into question whether several of the specific facts GLWS says collectively caused it to lose confidence in her leadership were accurately characterized, reasonably relied upon, or actually motivating the decision.

The evidence concerning Fortney's performance before the reassignment provides important context. Brooks, who directly supervised Fortney as Area Manager, testified that her April 2024 performance evaluation contained mostly fours, that she was at least meeting, and, in his view, more than meeting GLWS's expectations, and that her performance remained in line with GLWS's expectations during the period in which he supervised her. ECF No. 27-3, PageID.1246. Brooks further testified that Fortney's team met its sales targets and that he could not recall a specific occasion when he addressed deficient performance with her, explaining that such conversations were not frequent. *Id.* This evidence does not foreclose the possibility that GLWS subsequently developed legitimate concerns specifically concerning Fortney's leadership of the Fox Initiative. But a jury may consider the

assessment of Fortney's immediate supervisor in evaluating GLWS's contention that her leadership had deteriorated to the point that she could no longer remain an Area Manager.

The record also contains a direct factual conflict concerning GLWS's assertion that Fortney "refus[ed] to assist in training Peter Woods." ECF No. 27-11, PageID.1675. Howard testified that Lopus told him Fortney refused to assist Woods, and Howard relied on that purported refusal as one reason for the reassignment. ECF No. 27-4, PageID.1350. But the underlying email reflects Fortney asking for "a little more time," and Brooks testified that he did not interpret the communication as an outright refusal; rather, he understood Fortney to be asking for additional time. ECF No. 27-3, PageID.1272; ECF No. 27-15, PageID.1682-1684. GLWS responds that Fortney's delay nevertheless resulted in another employee handling the training and that Howard viewed her unwillingness to commit to a specific date as unacceptable for an Area Manager. ECF No. 30, PageID.2098. That is a permissible interpretation of the evidence. But a jury could likewise find significant the difference between an employee refusing to provide assistance and asking that the assistance be delayed, particularly where the person who characterized the conduct to Howard as a refusal was Lopus.

Similar disputes surround GLWS's assertion that Fortney undermined the Fox Initiative through "continued objections and questioning" and repeatedly required

clarification of expectations. ECF No. 27-11, PageID.1675. Howard testified that his understanding that Fortney continued to undermine the Fox Initiative was based, at least in part, on information from Brooks. ECF No. 27-4, PageID.1354. Yet when Brooks was asked whether Fortney had undermined the Fox Initiative through continued objections and questioning in meetings and before coworkers, he testified that he was "not familiar with that," although he agreed that she had questioned the Fox Initiative. ECF No. 27-3, PageID.1274. Brooks also initially did not know whether Fortney had repeatedly sought clarification in the manner described in the September 6 memorandum and testified that Fortney asking him for clarification was not itself a problem. ECF No. 27-3, PageID.1276. To be sure, GLWS points to Fortney's recorded comments during the August 15 meeting and Howard's perception that her continued questioning was inappropriate for an employee of her experience and position. ECF No. 30, PageID.2098-2099 (citing ECF No. 28-7, PageID.2011-2015, 2017-2018, 2061-2063). The evidence therefore does not compel a conclusion that Fortney never questioned or resisted the Fox Initiative. It does, however, create a factual dispute over whether the conduct GLWS subsequently characterized as persistent undermining was viewed that way by the supervisor who interacted with Fortney most directly and whose observations Howard says informed his decision.

GLWS's assertion that Fortney failed to control her commissioned sales

representatives presents a similar problem. GLWS contends that Fortney stated she was unable to control their conduct and that, as their Area Manager, responsibility for their conduct ultimately rested with her. ECF No. 18-12, PageID.763; ECF No. 30, PageID.2099, ECF No. 27-4, PageID.1358. Fortney disputes that characterization. ECF No. 27, PageID.1091. Brooks, for his part, could not identify a specific occasion when Fortney said she could not control her representatives, other than a portion of the August 15 discussion in which Fortney questioned whether management could physically require commissioned representatives to take certain actions within customer accounts. ECF No. 27-3, PageID.1285-1286. Howard testified that Fortney's immediate supervisor and managers below her also bore responsibility for controlling their direct reports, although GLWS maintains that Fortney's responsibility as Area Manager was greater. ECF No. 27-4, PageID.1358. Again, the Court does not decide whose characterization is more accurate. The competing testimony is relevant because GLWS relies upon Fortney's purported admission that she could not control her employees as one component of the cumulative justification for removing her from management.

The evidence underlying GLWS's customer-resistance rationale is likewise susceptible to competing interpretations. Howard identified three accounts in Fortney's area that he understood to be unwilling to work with Fox representatives. ECF No. 27-4, PageID.1346. But he did not speak with any of those customers

regarding whether Fortney or her team caused their resistance, and no customer told him that it refused to work with Fox because of something Fortney had done. *Id.* Rather, Howard testified that he assumed Fortney's undermining of the Fox Initiative explained the resistance based in part on his understanding of other information concerning her conduct. *Id.* GLWS correctly observes that the honest-belief doctrine did not require Howard to personally interview every customer or conduct an optimal investigation before acting. ECF No. 30, PageID.2098. The significance of the evidence is instead that the September 6 memorandum did not merely say that some customers in Fortney's area declined to work with Fox; it characterized the number as "inordinate" compared to the rest of the company. ECF No. 27-11, PageID.1675. Jacobs could not identify who made that comparative characterization and did not recall conducting the comparison Plaintiff says it implies. ECF No. 27-6, PageID.1452, 1454. A reasonable jury could therefore question not merely whether Howard's conclusion was correct, but how firmly the comparative conclusion on which GLWS says it relied was grounded in the information actually before management.

The same distinction matters with respect to the DIVER sales report. GLWS relies on that report to support its assertion that Fox Fine Wine trends were "dramatically worse" in Fortney's area than elsewhere in the company. ECF No. 27-11, PageID.1675; ECF No. 30, PageID.2097-2098. The report's unfavorable

figures are not disputed, and Fortney cannot establish pretext merely by showing the data could have been analyzed differently. But there is evidence raising questions about what the report actually measured. The report did not specify a date range, and Jacobs testified that it could have included data beginning as early as January even though the Fox Initiative launched in April. ECF No. 27, PageID.1087. Howard testified that the report included both Fox Fine Wine I and Fox Fine Wine II, while Fortney states that she never sold, managed, or supervised the Fox Fine Wine I book. ECF No. 27-4, PageID.1345; ECF No. 27-13, PageID.1678. Howard further testified that he used the report as presented and did not examine the underlying 438 accounts to determine whether external circumstances affected the year-to-year changes. ECF No. 27-4, PageID.1345. And when Jacobs, the person who generated the report, was presented with the circumstances Plaintiff contends affected the comparison and asked whether he still stood by the statement that Fortney's area was "dramatically worse," he responded that "[w]ith a lot of unknown, I'd have to look at it." ECF No. 27-13, PageID.1678.

GLWS is correct that none of those issues, individually, proves that Howard dishonestly relied on the DIVER report. *See Chen*, 580 F.3d at 401. Nor may the Court substitute its own preferred statistical analysis for GLWS's business judgment. But the honest-belief inquiry asks whether the employer reasonably relied upon the particularized information before it, not merely whether some document

existed that could be cited in support of the decision. Here, the person who generated the report expressed uncertainty about whether its figures supported the comparative conclusion stated in Fortney's demotion memorandum once the circumstances surrounding the data were considered. ECF No. 27-6, PageID.1452-1453; ECF No. 27-11, PageID.1675. Together with the evidence that the report encompassed business Fortney says she did not manage and potentially included a period predating the Fox Initiative, that is enough to permit a jury to assess whether GLWS reasonably viewed the report as evidence of Fortney's deficient leadership or instead used the data to support a decision reached for another reason.

The Court is also unpersuaded that Fortney's pretext theory depends upon establishing that GLWS formally changed its explanation over the course of the litigation. GLWS argues in Reply that the reasons identified in the September 6 memorandum have remained consistent through its Answer and Howard's deposition testimony. ECF No. 30, PageID.2097. Even accepting that characterization, consistently articulating an explanation does not eliminate factual disputes about whether management honestly believed the underlying facts or whether those facts actually motivated its decision. Here, Plaintiff identifies conflicts between several of the stated reasons and testimony from the managers who supplied or possessed the relevant information. Those disputes are materially different from a plaintiff merely disagreeing with an employer's assessment of

undisputed conduct.

Finally, these deficiencies are not considered in isolation from the circumstantial evidence discussed in the preceding section. GLWS's decision-making began immediately after the August 15 meeting at which Fortney again raised concerns regarding Lopus; Cooper testified that terminating Fortney would "look like retaliation"; and Lopus himself supplied information underlying at least some of the reasons later cited for her reassignment. Against that backdrop, evidence permitting a jury to question the factual foundation and characterization of several components of GLWS's asserted cumulative rationale takes on additional significance. The Court does not conclude that GLWS's proffered reasons were false, that Howard did not honestly believe them, or that retaliation actually motivated the reassignment. Those are factual determinations the Court cannot make at summary judgment.

Viewed as a whole and in Fortney's favor, the record would permit a reasonable jury to reject GLWS's explanation that it removed her from management solely because it had lost confidence in her leadership of the Fox Initiative and to infer instead that the stated concerns were used to justify a decision motivated by her protected activity. The same record would also permit a jury to accept GLWS's explanation that Howard reasonably relied on the information before him and reassigned Fortney because of genuine concerns about her leadership. Determining

which account is true requires weighing conflicting testimony, evaluating the reasonableness and credibility of GLWS's asserted reliance on the underlying facts, and deciding what actually motivated the decision. Those determinations belong to the trier of fact. Accordingly, Fortney has produced sufficient evidence of pretext to withstand summary judgment.

## IV.

Based on the foregoing, Fortney sufficiently established genuine disputes of material fact as to her retaliation claims under Title VII (Count I) and ELCRA (Count II). Plaintiff's claims must therefore proceed to trial for a trier of fact to determine: (1) whether there is a causal connection between Plaintiff's protected activity and her demotion; and (2) whether Defendant's proffered reason for the demotion was manufactured pretext.

Accordingly, **IT IS HEREBY ORDERED** that GLWS's Summary Judgment Motion (ECF No. 18) is **DENIED** as to each of Plaintiff's claims.

**IT IS FURTHER ORDERED** that GLWS's Motion to Strike (ECF No. 31) is **DENIED.**

**IT IS SO ORDERED.**

Dated: September 30, 2026
Detroit, Michigan

s/Brandy R. McMillion
HON. BRANDY R. MCMILLION
United States District Judge